UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

MERLE SATER, et al.,

    Plaintiffs,

    v.                                                    Case No. 3:23-CV-403-CCB

REPUBLIC SERVICES OF INDIANA
TRANSPORTATION LLC, et al.,

    Defendants.

## OPINION AND ORDER

Defendants have moved to exclude the testimony of Plaintiffs' experts Dr. Rick Wickstrom, Dr. George Shaw, and Sara Ford under Federal Rule of Evidence 702. They have also moved to strike the supplemental affidavits filed by Dr. Wickstrom and Sara Ford as an untimely disclosure under Federal Rule of Civil Procedure 26 and as unhelpful to the jury under Rule of Evidence 702.

### BACKGROUND

On August 3rd, 2021, a garbage truck operated by Defendant Republic Services of Indiana and driven by Defendant Travis Ottbridge crashed into the rear end of Plaintiff Merle Sater's pickup truck ("pickup"). (ECF 11). Republic Services of Indiana has admitted that the garbage truck driver was negligent and solely at fault for the accident, and that he was operating within the scope of his employment. (ECF 9 at 3, ¶ 8). Thus, the only remaining issues are the amount of damages and to what degree Mr.

Sater's alleged injuries were proximately caused by Defendants' negligence. (ECF 107 at 2–3).[1]

Plaintiffs' designated experts include Dr. George Shaw, who will testify about how the accident occurred and how it caused Mr. Sater's injuries, Dr. Rick Wickstrom, who will testify about the extent of Mr. Sater's current disability, and Sara Ford, who will testify about the extent of Mr. Sater's lost future-earnings capacity. Defendants have objected to these experts' testimony under Rule 702's *Daubert* inquiry on various grounds, including qualification and methodology. (ECF 70; 72; 74). They also argue that the supplemental affidavits filed by Dr. Wickstrom and Sara Ford are an untimely disclosure of expert materials under Federal Rule of Civil Procedure 26, and are unhelpful to the jury under Rule of Evidence 702. (ECF 92; 97).

## ANALYSIS

Expert testimony is admissible at trial under Federal Rule of Evidence 702 if the testimony is relevant to a fact in issue, is based on sufficient facts or data, and results from reliable scientific or other expert methods that are properly applied. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993). Before admitting expert testimony, courts "must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (internal quotation omitted). In

---

[1] Mr. Sater's wife, Cindy Sater, is also a Plaintiff in the case. (ECF 5).

making this determination, courts often look to factors such as whether a theory has been subjected to peer review or accepted within the relevant expert community, whether there are standards controlling the technique's operation, and whether it has a potential error rate. *See Deputy v. Lehman Bros.*, 345 F.3d 494, 505 (7th Cir. 2003). However, "No one factor is dispositive . . . and 'the Supreme Court has repeatedly emphasized [that] the Rule 702 test is a flexible one.' " *Timm v. Goodyear Dunlop Tires North Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019) (alteration in original) (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000)). In addition, "the correct inquiry focuses not on 'the ultimate correctness of the expert's conclusions,' but rather on 'the soundness and care with which the expert arrived at her opinion.'" *Id.* (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)). An expert's opinion "must consist of more than simply 'subjective belief or unsupported speculation.'" *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996) (citing *Daubert*, 509 U.S. at 589). The burden to establish the admissibility of an expert's testimony by a preponderance of the evidence falls on its proponent. *Varlen Corp. v. Liberty Mut. Ins.*, 924 F.3d 456, 459 (7th Cir. 2019).

Under Rule 702, an expert may be qualified to testify by "knowledge, skill, experience, training, or education." *Higgins v. Koch Dev. Corp.*, 997 F. Supp. 2d 924, 930 (S.D. Ind. 2014) (quoting Fed. R. Evid. 702). An expert is qualified if his "qualifications provide a foundation for [him] to answer a specific question." *Id.* (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). In other words, courts determine whether an expert is qualified by evaluating each of the expert's conclusions individually, then

assessing whether the expert has the "adequate education, skill, and training to reach them." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010). An expert's specialization, or lack thereof, "typically goes to the weight to be placed on [her] opinion, not its admissibility." *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016).

### A.  Dr. George Shaw

Plaintiffs have retained Dr. Shaw to testify regarding the physical forces of the accident and how those forces caused Mr. Sater's injuries. Defendants object to Dr. Shaw's qualification to testify about Mr. Sater's injuries, and also argue that his methodology for examining the physics of the accident is unsound.

### 1.  Qualifications

Dr. Shaw is a board-certified emergency physician who holds an M.D. from Georgetown University, a Ph.D. in physics from the University of Maryland, and a B.A. in physics from the University of Virginia. (ECF 79 at 1). He has served as a research physicist for the Navy, a research assistant in the Department of Physics at the University of Maryland, and has published and presented on biomechanics. (*Id.*). He is also an Adjunct Associate Professor of Emergency Medicine in the Biomedical Engineering program at the University of Cincinnati College of Medicine. (*Id.*). Dr. Shaw has been published in several peer-reviewed journals, and is a certified independent medical examiner. (*Id.*). His company, Shaw Biomedical Consulting, provides expert witness services in biomechanics, biomedical engineering, and emergency medicine. (*Id.*).

Defendants have not objected to Dr. Shaw's qualifications to testify about the physics of the accident, and this Court finds them sufficient. Rather, Defendants argue that he is not qualified to testify about the medical causes of Mr. Sater's injuries—specifically, about the cause of his cervical disc herniation. Defendants argue that while Dr. Shaw may have medical expertise, it is not in the relevant field, since he is "not a spine surgeon." (ECF 73 at 10).

Yet when deciding the scope of qualification for medical experts, courts have consistently emphasized that the relevant question is not whether the expert's resume, titles, or listed practice area "fits" the subject matter—indeed, "courts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats." *Gayton*, 593 F.3d at 617 (citing 29 Wright & Gold, Federal Practice and Procedure, § 6265 (1997)). Rather, courts look at "each of the conclusions [a medical expert] draws individually to see if he has the adequate education, skill, and training to reach them." *Id.* If a specific conclusion relies on "knowledge that any competent physician would typically possess," then the expert is likely qualified to testify. *Id.* at 618.

Here, although Dr. Shaw is not a "spine surgeon," he has experience in diagnosing injuries—including cervical disc herniations like Mr. Sater's—and deciding whether an injury requires further expert treatment. (ECF 79 at 12–13). In addition, Dr. Shaw has extensive experience in biomechanics, which in cases like these is applied to understand the cause of injuries. (*Id.* at 11). Here, Dr. Shaw is not testifying about the treatment of Mr. Sater's injury, but its cause. Dr. Shaw's medical experience in

5

diagnosis, as well as his expertise in general medicine and biomechanics, provides him with the foundation to answer specific questions about Mr. Sater's injuries, and renders him qualified as an expert. (ECF 78 at 12–13). *See Gayton*, 593 F.3d at 617.

### 2. Methodology

Defendants make several objections to Dr. Shaw's methodology for calculating the physical forces experienced by Mr. Sater. First, they argue that he improperly prioritizes the testimony of a witness who stated that before the accident he saw Defendants' garbage truck traveling at "40, 45, whatever the speed limit was." (ECF 72 at 4). However, this witness did not observe the accident itself. Defendants compare this statement with the findings of their accident-reconstruction expert, Michael O'Hern, who used physical data from the crash scene to estimate that the garbage truck was slowing down before impact and that its speed was between 17–21 mph at the time it hit Mr. Sater's pickup (*Id.* at 21). Defendants argue that "Dr. Shaw recklessly replaces the physical evidence with [the witness's] testimony." (*Id.* at 20). In addition, they argue that Dr. Shaw failed to consider specific variables which O'Hern referenced, including the angular impact between the vehicles. (*Id.* at 10).

But as Plaintiffs note, Dr. Shaw does not replace O'Hern's findings with the witness's testimony. Rather, he integrates them, using the witness's estimate as the higher bound for his calculations, and O'Hern's findings as the lower bound. (*Id.*). This does not contradict O'Hern's testimony at all—in his deposition, O'Hern did not assert that the data *refuted* a higher speed, but simply that he could not speculate about the possibility of a higher speed. (ECF 72 at 7) (stating that "I don't have the solid

foundation for the evidence" and "would not comment" on the possibility of the car speed ranging above his estimate based on "the data I have at this point"). O'Hern provides a recommended speed range but does not provide an absolute ceiling. Given this, it was reasonable for Dr. Shaw to integrate O'Hern's ex-post findings with the (admittedly imperfect) testimony of a witness present when the crash occurred. And, by incorporating O'Hern's findings, Dr. Shaw explicitly acknowledged the evidence which O'Hern based his findings on. (ECF 79 at 19) ("given that there was evidence of the [garbage truck] braking, the larger values of acceleration and delta-V are upper limits"). Of course, Dr. Shaw's results are not impregnable, just as the data on which he bases his opinions is not. Nor does he claim impregnable results—Dr. Shaw does not assert a *specific* speed or force, but rather a broad range of possibilities.

This is different from *Robb v. Burlington N. & Santa Fe Ry.*, 100 F. Supp. 2d 867 (N.D. Ill. 2000), the case which Defendants argue is "uncannily on point." In *Robb*, the expert picked one speed value without justifying his choice, gave no calculations based on other lower speed estimates, and "did not even consider the possibility that [the witness] might have been plausibly wrong about the speed." *Id.* at 872–73. Here, Dr. Shaw incorporates other lower speed estimates and considers the possibility that the witness might have been wrong—the lower end of his range estimate, 17 mph, accounts for the fact that the witness's statement about the garbage truck traveling at "whatever the speed limit was" may have been incorrect. (ECF 19–20).

If Defendants wish to critique the upper end of Dr. Shaw's range based on the reliability of his source, they may do so. But the fact that Dr. Shaw' calculations

amalgamated the various limited and imperfect sources at hand is not a reason to bar him from testifying. *See Manpower Inc. v. Ins. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) ("reliability is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology").

Defendants also argue that Dr. Shaw erred by using the acceleration rate for Mr. Sater's pickup as a stand-in for the acceleration experienced by Mr. Sater. Defendants argue that instead, Dr. Shaw should have performed a more granular analysis of the acceleration of Mr. Sater's body *inside* the pickup. (ECF 72 at 27). Thus, Defendants argue that Dr. Shaw presents an imperfect picture of the "occupant dynamics" inside the car. (*Id.*).

But as Plaintiffs point out, the exact dynamics of Mr. Sater's movement inside the car are difficult to reliably measure given limitations in the data. (ECF 79 at 20). This is almost always the case in car crashes and is why, as Plaintiffs explain, researchers often use the acceleration forces experienced by the car as a "surrogate" for the forces experienced by the occupant. (*Id.*). And, as Plaintiffs also point out, the specific occupant dynamics in this case are rendered even harder to measure by the fact that Mr. Sater's seat broke during the crash. (*Id.* at 20–21).

Given all this, Dr. Shaw's prudential choice to use better-known but more generalized data (the movement of Mr. Sater's pickup) in place of more specific but less well-known data (the movement of Mr. Sater inside the vehicle during the crash) does not render his methodology "speculation" or an "unfounded inference[]" and thus unreliable under Rule 702. *See Gopalratnam*, 877 F.3d at 783 (discussing how it is "not the

trial court's role to decide" whether an expert's "opinions were ultimately correct" but rather that the court is limited to "determining 'whether the methodology underlying that testimony [was] sound'" (quoting *Smith*, 215 F.3d at 719)). As always, these choices can be questioned in cross-examination.

Defendants also argue that Dr. Shaw's methodology in determining the cause of Mr. Sater's injuries was flawed in two respects. First, they argue that Dr. Shaw failed to address conditions evident in a prior 2003 MRI when analyzing a 2021 MRI of Mr. Sater taken after the accident. (ECF 72 at 32). But Dr. Shaw *does* address the relationship between these two MRI records, discussing how the 2021 MRI is "substantially different" from the 2003 MRI, and indicating changes which "are likely acute to subacute changes." (*Id.* at 23 & n.33). Second, Defendants argue that Dr. Shaw contradicts himself by stating that flexion and axial loading would be necessary for Mr. Sater's injuries, without providing any evidence that Mr. Sater experienced forces which would cause flexion/axial loading or providing sources which explain what the threshold for those forces would be. (ECF 72 at 33). But Dr. Shaw's statements about flexion/axial loading were a rule statement of medical doctrine—an observation about the type of forces necessary to cause the injuries observed in Mr. Sater. (*Id.* at 23). Dr. Shaw's conclusions about the presence of these forces are based on the fact of Mr. Sater's injuries, not the other way around. Defendants do not object or provide any evidence that this is incorrect as a statement of medical doctrine. Dr. Shaw's statements regarding injury causation are sufficient for Rule 702.

### B.  Dr. Rick Wickstrom

Plaintiffs retained Dr. Wickstrom to measure Mr. Sater's disability, which he did two times using a series of exercises called a Functional Capacity Evaluation ("FCE"). Both times, he concluded that Mr. Sater was 100 percent occupationally disabled and unable to perform any gainful work. (ECF 75 at 5).

Defendants do not object to Dr. Wickstrom's qualifications. Dr. Wickstrom received a Bachelor of Science at Ohio State University and his Doctorate in Physical Therapy from Alabama State University. He is certified as a medical examiner by the Federal Motor Carrier Safety Administration, has had leadership positions within the American Physical Therapy Association and the International Association of Rehab Professionals, and was president of the Occupational Health Special Interest Group of the American Physical Therapy Association ("APTA"). Dr. Wickstrom has also published more than 30 articles and book chapters on topics related to functional capacity testing and worker fitness. (ECF 82 at 9–10). Given this background, Dr. Wickstrom is qualified to testify as an expert on Mr. Sater's physical disability.

Defendants object that Dr. Wickstrom's FCE protocol has not been peer reviewed or published in any scholarly articles. However, while Dr. Wickstrom's FCE protocol, called the "WorkAbility FCE" has not been peer reviewed as such, it relies on a substantial amount of peer-reviewed material, including two key sources which have been authored by Dr. Wickstrom himself. In 2018, the Occupational Health Special Interest Group of the APTA commissioned Dr. Wickstrom and three other authors to compose a peer-reviewed resource on FCE performance, which was published by the

10

Academy of Orthopedic Physical Therapy. (ECF 81 at 12–13). Dr. Wickstrom also authored a peer-reviewed document on best practices for FCE implementation. (*Id.* at 13). These materials are extensively cited in Dr. Wickstrom's FCE protocol documents, along with other peer-reviewed sources. (ECF 81-4). Additionally, Dr. Wickstrom's FCE protocol has been licensed to other clinical groups. (ECF 81 at 12).

Defendants also argue that Dr. Wickstrom's evaluation of Mr. Sater deviated from the best practices described in his own sources by neglecting to use "objective" measurement tools such as a heart-rate monitor or force gauge. (ECF 75 at 9–10). For example, Dr. Wickstrom only used heart-rate measurements to obtain a baseline for Mr. Sater and only used a force gauge to measure grip strength. (ECF 75 at 11).

But Dr. Wickstrom explains that these decisions are entirely consistent with accepted methodology. For example, he notes that he did not make extensive use of a heart-rate monitor because Mr. Sater's use of beta blockers would render the readings unreliable for diagnosis purposes. (ECF 81 at 23). Defendants' own expert agreed with this. (ECF 81-6 at 1). Similarly, Dr. Wickstrom explains that he did not use a force gauge to conduct push/pull tests on Mr. Sater because that part of the FCE was designed to assess Mr. Sater's ability to perform his specific job as a truck driver—an occupation which does not require push/pull tests. (ECF 81 at 29).

Defendants argue that Dr. Wickstrom relied on "his own subjective beliefs" in recording Mr. Sater's responses, which violated his FCE protocol's guidelines and sources. (ECF 75 at 25). But Plaintiffs show that perceived exertion in conjunction with a professional's judgment is a valid measurement tool in the research community,

supported by many of Dr. Wickstrom's sources. (ECF 81 at 29–31). One source actually defends perceived exertion as a superior evaluation tool to heart rate and blood pressure responses. (*Id.*). Together, these sources show that in the FCE context, arbitrary subjective assertions are different from the "clinical observations of effort" which are consistent with best practices. (*Id.* at 30).

Finally, Defendants argue that Dr. Wickstrom's FCE implementation is not reliable because he reached different results in his follow-up FCE. But Mr. Sater had undergone cataract surgery, a total knee replacement, and physical therapy between the two exams. (*Id.* at 22). Given these changes, a modified spread of results does not indicate a problem with Dr. Wickstrom's methodology.

Defendants have also moved to strike Dr. Wickstrom's critical comments regarding their own expert, Andreas Lohmar. Defendants are correct that an expert may not attack the credibility of another expert. *See Bamcor LLC v. Jupiter Aluminum Corp.*, 767 F. Supp. 2d 959, 976 (N.D. Ind. 2011). However, critiques of another expert's methods or results are standard fare in the battle of the experts. *See id.* ("An expert may criticize the methods, calculations, and conclusions offered by the opposing side's expert . . . [s]uch criticisms aid the trier of fact in determining how much weight to assign the expert's opinion in deliberation."). Almost all of Dr. Wickstrom's comments appear to fall into this category.

As Defendants note, Dr. Wickstrom does state that Mr. Lohmar's opinion is "not a credible opinion." But "credibility" is an ambiguous term. It can mean that someone is not credible in the sense that their opinions are not well founded. *See* Webster's Third

New International Dictionary 532 (2002) (defining "credible" as "entitled to confidence"). In this sense, any time an expert makes a legitimate critique of another expert's methodology, he is calling their "credibility" into question. *See Bamcor*, 767 F. Supp. 2d at 976. However, in a legal context, credibility is about the honesty, truthfulness, or reliability of a witness. *See, e.g., Relational, LLC v. Hodges*, 627 F.3d 668, 673 (7th Cir. 2010) ("Credibility is earned, and here, [witness] simply failed to persuade the court that he was telling the truth"); *See also* Black's Law Dictionary, "witness," (2024) (defining "credible witness" as "a witness whose testimony is believable."). In the context of his report, Dr. Wickstrom appears to be making a claim about Dr. Lohmar's methodology, not his personal honesty or believability. Thus, this Court declines to strike or exclude that statement at this time. If it later appears that Dr. Wickstrom is making a credibility assessment of Mr. Lohmar in the legally inappropriate sense, Defendants are free to make another motion.

Defendants have also moved to exclude Dr. Wickstrom's testimony regarding the causation of Mr. Sater's injuries. For example, Dr. Wickstrom stated that Mr. Sater's inability to perform gainful employment was "a result of injuries suffered in the accident," which was a "career-ending event," and that the accident "worsened or aggravated . . . new areas of problems." (ECF 75 at 7–8). Plaintiff responds that Dr. Wickstrom is entitled to rely on medical diagnoses and opinions.

There are two problems with Dr. Wickstrom's statements. First, he does not clearly signal that his comments regarding Mr. Sater's injuries are mere references rather than his own expert opinions—and his statement that "I do have an opinion on

medical causation" does not help things. (*Id.* at 31). Second, even if Dr. Wickstrom *is* only relying on medical opinions, this Court must still evaluate whether his testimony in this area passes the *Daubert* threshold—here, whether it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Gopalratnam*, 877 F.3d at 779 (quoting *Meyers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). Plaintiffs have retained several physicians to discuss medical causation. (ECF 97 at 16). And Dr. Wickstrom has not explained how a discussion of causation is necessary to his analysis of Mr. Sater's ongoing disabilities. Thus, for Dr. Wickstrom to reference medical opinions which he did not reach himself and is not personally qualified to testify on will not assist the trier of fact in this case, and may mislead the jury by attributing Dr. Wickstrom's own expert credentials to the medical opinions which he merely relays. *See Daubert*, 509 U.S. at 595. Thus, this Court excludes Dr. Wickstrom from testifying in any way regarding the causation of Mr. Sater's injuries.

### C.  Sara Ford

Plaintiffs retained Ms. Ford to calculate Mr. Sater's lost earnings due to his injuries. Ms. Ford used an analysis known as the "Vocational Economic Rationale ("VER"), which involved several steps. First, Ms. Ford determined Mr. Sater's earning capacity before and after the accident, using his W-2 records and fringe benefit data from the U.S. Bureau of Labor Statistics. (ECF 77 at 9–10). Then, she projected these earnings across Mr. Sater's "worklife expectancy," or the number of years of future employment (in this case 6.6 years), while accounting for a compensation growth rate based on the average long-term growth rate measured by the U.S. Bureau of Labor

Statistics and a discount rate based on the return rate of U.S. Federal Reserve Treasury Bills (*Id.* at 10).

Defendants do not object to Ms. Ford's qualifications. Ms. Ford received her Bachelor of Arts in Labor Economics from the University of Cincinnati and her Masters of Rehabilitation Counseling from the University of Kentucky. She has provided testimony in more than 170 trials at the state and federal level. (ECF 77 at 4–5). The Court finds that Ms. Ford is qualified to testify regarding Mr. Sater's loss of earning capacity.

Defendants attack the reliability of Ms. Ford's VER methodology on two grounds. First, Defendants argue that Ms. Ford's methodology is not well regarded within the scientific community. Second, Defendants attack the methodology on its merits, arguing that it is unreliable because it is overly generalized and fails to account for Mr. Sater's specific life circumstances. (ECF 71 at 14).

Defendants assert that Ms. Ford's VER method has "never been peer reviewed," and cite three articles by two authors who have criticized its methodology. (*Id.* at 5). But Plaintiffs cite several peer-reviewed articles defending the VER's methodology. (ECF 77 at 13).[2] Additionally, a number of courts have agreed with the determination that Ms. Ford's methodology has been sufficiently peer reviewed. *See Honeycutt v. Cabins for You, LLC*, No. 3:21-CV-311, 2023 WL 6059790, at *7 (E.D. Tenn. March 13, 2023); ("The VER

_____

[2] There appears to be a dispute about whether one of the articles was published in the peer-reviewed section of a journal. Defendants assert that this article was invited for publication rather than evaluated by a panel. (ECF 71 at 3). However, this is not particularly important, because that is not the only peer-reviewed article Plaintiffs point to. (ECF 77 at 13).

methodology Ford relies on has also been peer-reviewed and endorsed by multiple journals and economists"); *Jenson v. Lowe's Home Centers, LLC*, No. 1:22-CV-1100-JRS-CSW, 2024 WL 1340324, at *4 (S.D. Ind. Mar. 29, 2024) ("a previous version of the [VER] has been published in a peer reviewed journal, as has support for the [VER] itself"); *Kaepplinger v. Michelotti*, No. 17- CV-5847, 2022 WL 267886, at * 12 (N.D. Ill. Jan. 28, 2022) (discussing how articles on the VER methodology have been "repeatedly accepted for publication in peer-reviewed journals and presented in peer-reviewed forums").

Nor does the fact that some economists have criticized this method render it inadmissible under *Daubert*. See *Erickson v. Baxter Healthcare, Inc.*, 151 F. Supp. 2d 952, 965 (N.D. Ill. 2001) ("defendants cite no authority to support the notion that 'consensus' is the touchstone of reliability under Rule 702"). It is not for this Court to pick a side in an academic debate about economic predictions. See *Schultz* 721 F.3d at 433 ("Rule 702 [does] not require, or even permit, the district court to choose between . . . two studies at the gatekeeping stage. Both experts [are] entitled to present their views, and the merits and demerits of each study can be explored at trial.").

Defendants cite articles criticizing the method, (ECF 71 at 6), but Plaintiffs cite articles in the same journal, responding to this criticism (ECF 77 at 16). Defendants point to a survey in which roughly 62 percent of respondents criticized a key component of the VER method. (ECF 71 at 27). However, the flipside of this is that roughly 18 percent of economists answered that they *did* consider that component "reliable for purposes of estimating work life." *Id.* Given that this survey had 170 respondents, and all respondents were members of the National Association of Forensic

Economics ("NAFE"), that's roughly 30 positive responses from members of NAFE. (ECF 70-1 at 179) (citing Michael L. Brookshire et al., *A 2009 Survey of Forensic Economists*, 21 J. Forensic Econ. 5, 22–23 (2009)). Rather than showing a comprehensive institutional rejection, all Defendants' sources tend to show is an ongoing debate. And the presence of an ongoing academic debate does not by itself render a methodology unreliable for purposes of *Daubert*. *See Schultz*, 721 F.3d at 433.

Defendants argue that the VER method is problematic because it does not use occupation-specific statistics to calculate either Mr. Sater's remaining worklife expectancy time or his future earnings growth. (ECF 71 at 4–5, 20, 26). Instead, Ms. Ford used "broad survey data for all U.S. workers." (*Id.*). Despite Defendants' claim that their objection is more about Ms. Ford's methodology than her data, it really does concern data—specifically, the fact that she did not use more individually-tailored data for predicting Mr. Sater's wage growth rate and worklife expectancy. (ECF 71 at 33).

But Defendants fail to show that Ms. Ford's use of general statistical data renders her analysis methodologically unreliable for purposes of Rule 702. First, as Plaintiffs note, it might be predictively problematic to use highly specific data, because "it is incorrect to say a given worker's worklife expectancy and earning capacity are limited to a single occupation." (ECF 77 at 12). After all, a worker might switch jobs or locations, or acquire new training or certifications during his lifetime. Thus, a prediction based purely on the wage growth for a specific type of occupation might fail to statistically account for the probability of switching occupations. (*Id.*).

Moreover, Defendants do not respond to Plaintiffs' assertion that the data for the "average wage growth of similarly situated individuals," — in this case, truck drivers — simply does not exist at this time. (*Id.* at 12). Thus, while there is substantial data recorded by the U.S. government on the general wage growth rate, Defendants have not shown that job-specific data exists. (*Id.*). Defendants argue that Ms. Ford's methodology is inadequate as compared to an alternate hypothetical methodology, but they do not show that this alternate methodology is realistically possible.

Ms. Ford's VER is a far cry from the inadmissible examples cited by Defendants. *See e.g.*, *Am. Honda Motor Co. v. Allen*, 600 F.3d 813 (7th Cir. 2010) (excluding expert who, without any support, asserted what he thought was a "reasonable" performance standard); *Gopalratnam* 877 F.3d at 784 (excluding expert whose "central underlying premise" about battery chemistry was "not only unsupported, but in fact contrary to generally accepted battery science"); *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000) (affirming exclusion of expert whose "methodology" was mere "talking off the cuff — deploying neither data nor analysis").

The VER method's wide adoption among courts across the country and in this circuit confirms that it is reliable for purposes of Rule 702.[3] *See Eliason v. Superior Ref. Co. LLC*, No. 19-CV-829-WMC, 2021 WL 4820252, at *6 (W.D. Wis. Oct. 15, 2021); *Rossi*, 2013 WL 1632065, at *2-4 (N.D. Ill. Apr. 16, 2013); *Dahl v. Hofherr*, No. 3:14-CV-1734-MGG,

---

[3] Defendants cite *Sturgis v. R&L Carriers, Inc.*, 554 F. Supp. 3d 976 (N.D. Ind. 2021) as an example of a case where a court found the VER unreliable under Rule 702. However, that case was an outlier at the time, and courts have declined to follow its analysis. *See, e.g.*, *Honeycutt*, 2023 WL 6059790; *Eliason*, 2021 WL 4820252; *Kaepplinger*, 2022 WL 267886.

2016 WL 8668498, at *8-9 (N.D. Ind. Nov. 18, 2016); *Barr v. United States*, No. 315-CV-01329-DRH-PMF, 2018 WL 4815413, at *6 (S.D. Ill. Oct. 4, 2018).

The use of statistical generalities does not render Ms. Ford's VER methodology pure speculation or guesswork. Rather, the methodology takes known starting conditions (Mr. Sater's salary at the time of his injury) and extrapolates those conditions into the future. Like any statistical predictive method, Ms. Ford's VER depends on data which is necessarily general to some degree, and thus will never be perfect—not because Ms. Ford's method is "unreliable" in the sense that it is speculative or arbitrary, but because any general approximation can fail to predict a specific individual's future. Defendants are free to question how applicable these generalities are in cross-examination. *See Artis v. Santos*, 95 F.4th 518, 527 (7th Cir. 2024) ("After the *Daubert* threshold, the 'familiar tools of vigorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof' will do." (quoting *Lapsley v. Xtec, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (internal quotations omitted)). The Court finds that Ms. Ford's method is reliable for purposes of Rule 702 by a preponderance of the evidence.

### D.  Supplemental Affidavits of Sara Ford and Dr. Rick Wickstrom

Defendants have also moved to strike the supplemental affidavits of both Sara Ford and Dr. Rick Wickstrom under Rule of Civil Procedure 26 and Rule of Evidence 702.

19

### 1. Rule 26

Federal Rule of Civil Procedure 26(a)(2)(B) dictates that a party must accompany its disclosure of an expert witness with a written report containing "a complete statement of all opinions the witness will express and the basis for them" as well as "the facts or data considered by the witness" in forming the opinions. If a party fails to comply with this requirement, then they cannot use that witness to supply evidence unless the failure was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). However, under Rule 26(e)(1), a party who has made a disclosure "must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect."

Thus, when a party files a supplemental affidavit after an expert disclosure, courts must determine whether the affidavit is truly "supplemental" under Rule 26(e), or an attempt to subvert the requirements of Rule 26(a) by amending or replacing the data or theoretical basis for the expert's opinion. Parties may not "offer new opinions under the guise of the supplemental label" or "sandbag one's opponent with claims and issues which should have been included in the expert witness' report." *Whole Woman's Health Alliance v. Hill*, No. 1:18-CV-01904-SEB-MJD, 2020 WL 7129727, at *2 (S.D. Ind. Dec. 3, 2020) (citing *Welch v. Eli Lilly & Co.*, No. 1:06-CV-0641-RLY-JMS, 2009 WL 700199, at *4 (S.D. Ind. Mar. 16, 2009)); *Allgood v. Gen. Motors Corp.*, No. 1:02-CV-1077-DFH-TAB, 2007 WL 647496, at *3 (S.D. Ind. Feb 2, 2007)). A "purportedly supplemental report that is prepared by a different expert or introduces new theories is better characterized as a new report." *Cerda v. Chicago Cubs Baseball Club, LLC*, No. 17-C-9023,

2023 WL 11951488, at *3 (N.D. Ill. Apr. 6, 2023) (citing *Allstate Ins. v. Maytag Corp.*, No. 98-C-1462, 1999 WL 203349, at * 6 (N.D. Ill. Mar. 30, 1999)). Thus, courts will discard supplemental affidavits which conflict with prior deposition testimony or add significant new theoretical material. On the other hand, "[a] revised expert report that is consistent with the core opinions expressed in the original expert report is likely to qualify as a supplemental report." *Id.* (citing *Gilbane Bldg. Co. v. Downers Grove Cmty. High Sch. Dist. No. 99*, No. 02-C-2260, 2005 WL 838679, at *8 (N.D. Ill. Apr. 5, 2005)).

With regard to Ms. Ford, the titles of her additional sources identify them as responses to some of the key arguments made by Defendants in their motion to exclude her testimony. One of the sources is a response to an academic article cited by Defendants. (ECF 105 at 2). And the other is a response to the district court case that Defendants rely on for many of their arguments. (*Id.*). These opinions are consistent with Ms. Ford's initial disclosure, and fall within the ambit of a legitimate response to arguments raised in Defendants' *Daubert* motion. An expert does not need to "cover any and every objection or criticism of which an opposing party may conceivably complain," in their initial disclosure, and need not "stand mute in response" to an opposing party's *Daubert* motion. *Kapplinger v. Michelotti*, No. 17-CV-5847, 2022 WL 267886, at *12 n.21 (N.D. Ill. Jan. 28, 2022)(citing *Allgood v. Gen. Motors Corp.*, No. 102-CV-1077-DFH-TAB, 2006 WL 2669337, at *5 (S.D. Ind. Sept. 18, 2006)).

In Dr. Wickstrom's case, Defendants make a perfunctory reference to several parts of his Affidavit as examples of "new theories or factual bases," specifically, his statements that: Mr. Sater's medications disqualified him from driving a truck; no jobs

were available to Mr. Sater because he could not "manipulate competitively"; Mr.

Sater's FCE was split between a job-specific and "any occupation" category; and that he

was trained in a certain FCE method (the "Blankenship" method). Defendants also

object to the Affidavit's explanation of how the different results in the second FCE

resulted in the same conclusion as the first. (ECF 106 at 3 & n. 1).[4]

However, each of these statements is not providing a "new theory" but simply

providing additional detail to address arguments made by Defendants.

Mr. Sater's medications were listed as part of the recorded data in Dr.

Wickstrom's second FCE report. (ECF 67-8 at 104). Dr. Wickstrom re-emphasized this in

his Affidavit in order to respond to Defendants' contention that Dr. Wickstrom's

conclusions were unfounded—but no new data was introduced. Likewise, Dr.

Wickstrom's description of Mr. Sater as being unable to "manipulate competitively"

was an elaboration of his earlier finding that Mr. Sater had limited mobility in actions

that involved changing posture or bending his neck. (ECF 67-8 at 110). Dr Wickstrom's

discussion of "job-specific" and "any occupation" components was not a "new theory"

but rather a response to Defendants' argument that he did not properly tailor his

examination criteria. (ECF 101 at 6). Dr. Wickstrom mentioned that he was trained in

the "Blankenship" functional capacity evaluation method in order to demonstrate that

he was qualified to rebut the opinions of Defendants' own expert, who was trained in

---

[4] Defendants also object to the fact that Dr. Wickstrom "did not disclose that he did not perform a keyboard test during FCE 2." ((ECF 106 at 3 & n. 1). It is hard to see how an expert's follow-up statement about what he did *not* do (and did not claim to do) is "new material" for purposes of this analysis.

the Blankenship method. (ECF 81-3 at 17). Last, Dr. Wickstrom discussed the differences between his two FCE's in order to rebut the Defendants' claim that the inconsistencies between them were a sign of invalidity—explaining that the differing FCE data was "consistent with the interventions that Mr. Sater had between my two exams." (ECF 81-3 at 14).

Defendants also point to an article discussed in the Affidavit which was not mentioned in Dr. Wickstrom's deposition (but was cited in Dr. Wickstrom's original disclosure). (ECF 101 at 7). But Dr. Wickstrom and Plaintiffs place special emphasis on this article in order to respond to Defendants' argument that his clinical observations of perceived pain or exertion were not a reliable or valid measurement tool.  (ECF 81-3 at 17; ECF 82 at 30–31). Thus, the subsequent heightened focus on the article is not a change of theory or belated disclosure of critical material.

### 2.  Rule 702

Defendants also argue that both Dr. Wickstrom and Ms. Ford's affidavits should be stricken as unhelpful to the jury under Fed. R. Evid. 702. These arguments mainly duplicate the arguments for striking the affidavits under Rule 26. For Dr. Wickstrom, the Defendants argue that his Affidavit "offer[s] new opinions" or is a "desperate attempt" to "cobble together" an ex-post explanation. (ECF 97 at 3). This argument fails since, as explained above, Dr. Wickstrom's supplemental comments are not "new opinions" but responses to points made by the Defendants. For Ms. Ford, Defendants object that her Affidavit is unhelpful since it is primarily a response to arguments

discussed in a case where her method was rejected. (ECF 105 at 5). But Defendants extensively rely on that case, so this focus is warranted. (ECF 71 at 4).

Given that the jury must determine how much weight to give Ms. Ford and Dr. Wickstrom's testimony, this Court finds that the additional responsive methodological discussion provided in both supplemental affidavits will be helpful to the jury. The Court declines to strike Plaintiffs' supplemental affidavits of Dr. Wickstrom and Ms. Ford under Rule 702.

### CONCLUSION

For the foregoing reasons, Defendants' motions to exclude the expert testimony of Sara Ford and Dr. George Shaw are **DENIED**. (ECF 70; 72). Defendants' motion to exclude the expert testimony of Dr. Rick Wickstrom is granted (in part) only as to Dr. Wickstrom's testimony regarding the causes of Mr. Sater's injuries. (ECF 74).

SO ORDERED on December 8, 2025.

_/s/ Cristal C. Brisco_
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT