UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

MERLE SATER, et al.,

    Plaintiffs,

    v.

REPUBLIC SERVICES OF INDIANA
TRANSPORTATION LLC, et al.,

    Defendants.

Case No. 3:23-CV-403-CCB

## OPINION AND ORDER

On January 27, 2026, this Court ruled on Defendants' motion in limine to exclude the testimony of Plaintiffs' proposed expert witness Dr. Devin Zimmerman, finding that Dr. Zimmerman was qualified to testify ("Order"). (ECF 135 at 15). Defendants made a motion to reconsider that portion of the Order. (ECF 140). The Court now rules on the motion.

### STANDARD

A motion for reconsideration serves a very limited purpose in federal civil litigation; it should be used only "to correct manifest errors of law or fact or to present newly discovered evidence." *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987) (quoting *Keene Corp. v. Int'l Fid. Ins. Co.*, 561 F. Supp. 656, 665–66 (N.D. Ill. 1982), *aff'd*, 736 F.2d 388 (7th Cir. 1984)). While it is true that any nonfinal decision or order is subject to revision at any time before the entry of judgment, Fed. R. Civ. P. 54(b), such revisions are discouraged. "A court has the power to revisit prior decisions

of its own . . . in any circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817 (1988) (quoting *Arizona v. California,* 460 U.S. 605, 618 n. 8 (1983)). In general, "litigants must fight an uphill battle in order to prevail on a motion for reconsideration." *United Air Lines, Inc. v. ALG, Inc.,* 916 F. Supp. 793, 795 (N.D. Ill. 1996).

ANALYSIS

### A. Rule 702 and Discovery Deadlines

Defendants take issue with the Order's discussion of waiver. The Court notes that, especially after the 2023 revision of Rule 702, it is ambiguous to what degree courts maintain docket control over argument waiver with regard to Rule 702.[1] Even so, the Court's order did not rest on the legal issue of whether the parties waived a Rule 702 argument, but merely admonished the parties that compliance with Rule 702 *Daubert* deadlines is of the utmost importance and cannot be excused by a court's gatekeeping role. (ECF 135 at 17) (declining to finally resolve the waiver question because "regardless, Dr. Zimmerman's methodology is reliable under Rule 702").

Under Rule 702, the burden to show an expert's reliability is on the proponent. Defendants argue that the Court "flipped" this burden when it suggested that they should have engaged in discovery to determine potential flaws in Dr. Zimmerman's

---

[1] On one hand, Rule 16 of Civil Procedure provides a court with extensive authority to manage its docket, including issuing any "just orders" if a party "fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f). If this authority encompassed scheduling orders regarding Rule 702 objections, it would allow for a court to consider an argument waived because it was not timely filed. *See, e.g.*, *United States v. Dish Network, LLC*, 75 F. Supp. 3d 916, 920 (C.D. Ill. 2014). On the other hand, Rule 702 in its 2023 form, by directing that judges act as independent gatekeepers of expert testimony, might be read to imply that a district court must consider Rule 702 arguments regardless of the deadlines set under Rule 16.

2

methodology prior to the Court's *Daubert* deadline. (ECF 140 at 6, 18). But discovery is part of the cost of litigation. *See Generation Brands, LLC v. Decor Selections, LLC*, No. 19 C 6185, 2021 WL 780485, at *2 (N.D. Ill. Mar. 1, 2021) ("Although discovery is, by definition, invasive, parties to a lawsuit must accept its travails as a natural concomitant of modern civil litigation." (quoting *Cusumano v. Microsoft Corp.,* 162 F.3d 708, 717 (1st Cir. 1998))). Bearing the costs inherent in litigation is different from bearing a specific legal burden. While a court has an absolute duty to gatekeep unreliable expert testimony under Rule 702, the thoroughness and sufficiency of its analysis are necessarily controlled by the arguments and evidence placed before it by the parties in a timely manner. *See Bernacchi v. First Chic. Ins. Co.*, 52 F.4th 324, 328 (7th Cir. 2022) ("parties 'frame the issues for decision,' whereas the courts play 'the role of neutral arbiter of matters the parties present.'") (quoting *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020))). The Rule 16 *Daubert* deadlines set by this Court are meant to ensure that the Rule 702 analysis is dealt with as thoroughly and with as much information as possible. This is an exercise, not an abdication, of the Court's Rule 702 gatekeeping role.

## B. Whether the Court's Rule 702 Legal Analysis Was Correct

Defendants argue that the Court effectively applied an older version of Rule 702 when it cited to Seventh Circuit Caselaw from before the 2023 revision of Rule 702. (ECF

140 at 10).[2] In *Smith v. Ford Motor Company*, the Seventh Circuit discussed how an expert's analysis could pass muster under Rule 702 if it "employ[ed] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 215 F.3d 713, 719 (7th Cir. 2000) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). The Seventh Circuit also held that an expert's analysis could be reliable if the expert's application of a methodology to the facts of the case was "based on his extensive practical experience in [the] area." *Id.* at 720.

As Defendants note, Rule 702 has been amended several times since *Smith*, each time clarifying the principles of analysis that courts should use when evaluating an expert's reliability under the Rule. For example, as compared to the version of Rule 702 referenced by *Smith*, the latest version of Rule 702 formally splits the reliability analysis into five separately listed criteria. *Compare* Fed. R. Evid. 702 (2023) *with* Fed. R. Evid. 702 (1998). Most recently, the 2023 amendment to Rule 702 ("2023 amendment") clarifies that courts have an independent gatekeeping role in ensuring the reliability of experts by a preponderance of the evidence. Fed. R. Evid. 702 advisory committee's note to 2023 amendment, n.1 [hereinafter "2023 advisory comments"]. The comments to the amendment stressed that this was done to emphasize that the reliability of an expert's methodology is a question of admissibility for the court and not to be weighed by the jury. *Id.* ("many courts have held that the critical questions of the sufficiency of an

---

[2] Defendants also attempt to argue that the Court misquoted Rule 702, "mistakenly using 'or' when 'and' is required." (ECF 140 at 12). But the Court was not quoting Rule 702, but interpretive language from *Smith* (and the Supreme Court). *See* (ECF 135 at 17). As discussed in this section, *Smith*'s guidance on Rule 702 is not only valid but still binding on this Court.

expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rule[] 702").

Thus, any caselaw before or after the 2023 amendment which holds that expert reliability is a question of weight for the jury would be invalid. *See Delaware v. Pennsylvania*, 598 U.S. 115, 120 (2023)(changes in the relevant law can abrogate precedent); *United States v. Mitan*, 966 F.2d 1165, 1170 (7th Cir. 1992)("The rules of evidence are not advisory—they are obligatory"). At the same time, the amendments to Rule 702 were clear that they did not change the Rule's meaning, but merely clarified its application. *See* 2023 advisory comments, n. 2 ("Nothing in the amendment imposes any new, specific procedures"). Thus, any binding circuit caselaw that properly interpreted and applied Rule 702 prior to the 2023 amendment would be equally binding on this Court after the amendment as before it. *See In re Abbott Lab'ys, et al., Preterm Infant Nutrition Prods. Liab. Litig.*, No. 22 C 00071, 2025 WL 2987083, at *4 (N.D. Ill. Oct. 23, 2025) ("This Court is bound by the Seventh Circuit's interpretation of the relevant federal procedural rules, including the Federal Rules of Evidence" (citing *In re Abbott Lab'ys, et al, Preterm Infant Nutrition Prods. Liab. Litig.*, No. 22-c-71, 2022 WL 3716277, at *3 (N.D. Ill. Aug. 29, 2022))); *Brown v. City of Chicago*, 709 F. Supp. 3d 558, 576 (N.D. Ill. 2023) ("this [district] Court must follow [the Seventh Circuit's] precedent unless and until the Supreme Court or the Seventh Circuit holds otherwise"); *Haynes v. United States*, 873 F.3d 954, 955 (7th Cir. 2017) ("The Supreme Court has under advisement a case . . . that may reveal whether [Seventh Circuit cases] correctly applied

[a Supreme Court case], but the district judge properly treated [our] decisions as controlling unless the Justices say otherwise.").

Defendants fail to show any indication that *Smith* improperly applied Rule 702 as currently implemented. In fact, far from making the weight-versus-admissibility errors flagged by the 2023 amendment, the Seventh Circuit emphasized the court's gatekeeping role. *See Smith*, 215 F.3d 713 at 718 ("When making [expert evidence admissibility] determinations, the district court functions as a 'gatekeeper' whose role is 'to keep experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves.'" (quoting *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998)). Nor can Defendants cite a single case suggesting that the relevant discussion in *Smith* is invalidated by any Rule 702 amendments or subsequent caselaw.

Defendants also argue that the Court conflated the Rule 702 qualification and methodology analyses. (ECF 140 at 12). Defendants assert that this Court found Dr. Zimmerman's methodology reliable solely because he possessed "extensive practical experience." (ECF 140 at 3). This is a misrepresentation of the Court's opinion. The Court's discussion of "practical experience" and "intellectual rigor" was an analysis of whether Dr. Zimmerman *applied* his practical experience and knowledge to the facts at hand. (ECF 135) ("Here, Dr. Zimmerman *applied* his medical expertise to the MRI imaging of Mr. Sater performed after the accident, *evaluated* the accounts of what occurred at the accident, and *performed* a physical examination of Mr. Sater. He also *evaluated* imaging of Mr. Sater before the accident prior to his testimony.") (citations

omitted) (emphases added). This analysis directly addresses the questions presented by Rule 702: whether an expert possesses "specialized knowledge," whether the testimony is "based on sufficient facts or data" and "reliable principle and methods," and whether "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

### C. Whether the Court's Rule 702 Factual Analysis was Correct

Defendants argue that the Court's opinion was flawed because it "does not even mention" that, as Defendants assert, Dr. Zimmerman "did not conduct any sort of medical analysis or testing to determine the cause of Mr. Sater's headaches." (ECF 140 at 16). Of course, if it was actually true that Dr. Zimmerman "did not conduct any sort of medical analysis," a Rule 702 reliability finding would be improper. In making that assertion, Defendants cite several isolated quotations from Dr. Zimmerman's trial deposition.

The first quote is that "it really doesn't matter to me in terms of treatment of his headache pain and neck pain of how I treat him." (ECF 111-1 at 28). Defendants argue that this statement indicates Dr. Zimmerman "doesn't care what caused Mr. Sater's headaches," which in turn means that he did not actually perform any medical analysis on the issue. (ECF 111 at 31). But there are several problems with this interpretation of Dr. Zimmerman's statement. First, Dr. Zimmerman was specifically addressing prior *treatments* of Mr. Sater, not prior potential *causes* of his injuries. (ECF 111-1 at 28) ("They were asking [whether] I was aware of previous treatments"). Second, Dr. Zimmerman did not say he "did not care" about causation or prior medical treatment, but only that

"it really doesn't matter to me *in terms of treatment of his headache pain and neck pain*." (*Id.* (emphasis added). Thus, this quote has no relevance to Dr. Zimmerman's causation opinions.

Next, Defendants point to Dr. Zimmerman's answer "yes" to the following questions on cross-examination: (1) "the statement that Mr. Sater made to you [about not having headaches before the August 2021 automobile accident and having them after the accident] is the basis for your opinion that his headache problems are related to the accident" and (2) "you didn't go through any kind of specialized testing or analysis to try to figure out [whether or not the headaches were caused by the accident]?" (ECF 111-1 at 29).

Taken in isolation, Dr. Zimmerman's answers are ambiguous. Does his response that Mr. Sater's information was "the basis" for his opinion mean that it was the *entire* basis for his causation opinion, or merely the *factual* basis for Mr. Sater's experience of prior incidents which could have caused his headaches. Does "any kind of specialized testing or analysis" mean that Dr. Zimmerman performed no analysis at all, or that he performed no *specialized* analysis—i.e., beyond his normal medical diagnostics? Defendants' assertion that Dr. Zimmerman performed "no medical analysis" rises or falls on the answer to these questions.

As the Seventh Circuit has emphasized, statements from testimonial evidence should not be taken in isolation but evaluated as a whole. *See Ayi v. Gonzales*, 460 F.3d 876, 881 (7th Cir. 2006). Here, other statements from Dr. Zimmerman's trial deposition

clarify that he *did* perform medical analysis and evaluation regarding Mr. Sater. This additional evidence contextualizes Dr. Zimmerman's statements.

For example, Dr. Zimmerman performed a robust physical examination on Mr. Sater[3] and an examination of his neck, specifically his "carotid artery." (ECF 111-1 at 13). Dr. Zimmerman also reviewed the MRI report taken after the crash and ascertained from the report that Mr. Sater had "encephalomalacia, or damage to the spinal cord." (*Id.* at 14). Dr. Zimmerman personally ordered and analyzed an MRI of Mr. Sater's brain. (*Id.* at 15). Dr. Zimmerman also reviewed an MRI from before the crash, ascertaining that it showed "some congenital narrowing of the spine" and "moderate disc bulging" but that the discs "didn't actually compress" the spinal cord and "there was no evidence of a encephalomalacia in that MRI scan." (*Id.* at 17).

Finally, Dr. Zimmerman responded that "based upon [his] physical examination or review of the medical records" he "felt that [Mr. Sater] had chronic headaches secondary to previous neck trauma" and that "[b]ased on a reasonable degree of medical certainty, it is my opinion that his chronic headaches and neck pain are caused by the trauma that was sustained in the accident of August 2021." (*Id.* at 22–23). He also determined that Mr. Sater had "chronic hypersensitization of nerves" which is where the "input systems [of the nervous system[] are broken or [sic] injured in some way" such that "input that would be normal under normal circumstances . . . can start generating pain." (*Id.* at 50–52).

---

[3] *See* (ECF 111-1 at 13) (reporting on his evaluation of Mr. Sater's gait, mental status, cranial nerves, strength, sensation, and reflexes).

In reaching this conclusion, he excluded other medical diagnoses and possibilities, such as migraine headaches and "cluster headaches," because "the sharp pain above his left eye does not fit with cluster headaches." (*Id.* at 16, 21). He also reviewed medical treatment records from 2023 to 2024. (*Id.* at 55). Dr. Zimmerman had extensive knowledge of Mr. Sater's medical history, including what other doctors he was seeing, what types of symptoms he had received treatment for, the types of treatment he had received, and what the side effects of those treatments could be.[4]

This evidence belies Defendants' interpretation of Dr. Zimmerman's statement as indicating that he did not perform "any sort of medical analysis" and admitting that his opinion was "based *only* on Mr. Sater's self-reports"). (ECF 111 at 31) (emphasis in original).

Defendants argue that Dr. Zimmerman's opinion is unreliable because he was not aware of "crucial aspects of Mr. Sater's medical history" (ECF 140 at 15). These "crucial aspects" are two hospital records showing that Mr. Sater had visited the emergency room with complaints of headaches in 2003. (111-1 at 48); (111-2); (111-3).

---

[4] *See* (ECF 111-1 at 46) ("he had some headaches and neck pain prior to this back in 2003, when he was seen by Dr. Vidic"); (*Id.* at 21) ("We discussed modifications of his medications. [He was] [o]n a fairly low dose of pregabalin at the time"); (*Id.* at 20) ("he was still taking oxycodone as a pain medication. He was taking Robaxin as a muscle relaxer. The medication in my note comments about a medication called Lyrica"); (*Id.* at 16) ("He was already being treated by a pain management doctor . . . he was on chronic narcotics"); (*Id.* at 45) ("[narcotic pain medication] can cause overuse headaches").

But as Defendants themselves note, omitted prior medical history must be significant enough to call into question the reliability of the expert's opinion.[5] Defendants' only argument regarding these records is that they disprove Mr. Sater's report to Dr. Zimmerman that "he never had headaches prior to the collision." (ECF 111 at 31). Dr. Zimmerman does confirm that Mr. Sater's initial self-reports did not include his treatment for headaches in 2003. But Dr. Zimmerman's testimony is also clear that, at the time he gave his expert medical opinion in the trial deposition, he was well aware that Mr. Sater had experienced issues with headaches before the crash, and had addressed that evidence. (ECF 111-1 at 46) ("I was sent medical records . . . turned out he had some headaches and neck pain prior to this back in 2003"). Yet Dr. Zimmerman explained that Mr. Sater was given "cervical trigger point injections" and "neuroplasty" in September 2003, and that "after his treatment with neuroplasty . . . . [H]e was having no more headaches, no more neck pain." (*Id.* at 46–47).

The records of the emergency room visit records submitted by Defendants clearly indicate that those visits took place in February and March of 2003— before the September 2003 treatments that Dr. Zimmerman testified had resolved Mr. Sater's headache symptoms. (ECF 111-1 at 46); (ECF 111-2); (ECF 111-3). Thus, those records do

---

[5] *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 645 (7th Cir. 2010) (holding that when an expert is "unaware of aspects of [plaintiff's] work or medical history, that doesn't necessarily mean the expert should be struck," and reasoning that omitted medical history rendered expert opinion unreliable only when experts "knew little to nothing about [plaintiff's] medical history," self-reported or otherwise); *LeClercq v. The Lockformer Co.*, No. 00 C 7164, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005) (excluding expert opinion when the expert disregarded data that "undermines the reliability of [expert's] entire opinion"); *West v. Home Depot U.S.A., Inc.*, No. 21 CV 1145, 2024 WL 1834112, at *6 (N.D. Ill. Apr. 26, 2024) (refusing to find unreliability merely on the basis of "inaccurate self-reported medical history," but only when the specific omitted history was "crucial to understanding causation.").

not add any significant information to Dr. Zimmerman's knowledge of Mr. Sater's medical history. They are only further evidence of what Dr. Zimmerman already knew—that Mr. Sater experienced problems with headaches prior to his treatments in late 2003. Thus, Dr. Zimmerman's opinion was based on "sufficient facts and data," and the omitted emergency room visits do not render Dr. Zimmerman's opinion unreliable. Fed. R. Evid. 702. *See also Myers*, 629 F.3d at 645; *West*, 2024 WL at *6.

Finally, Defendants reiterate their argument that Dr. Zimmerman's opinion is unreliable because he did not perform a "differential etiology." (ECF 140 at 19). This argument fails both legally and factually.

First, Defendants are incorrect that differential etiology is necessary to render a medical expert's causation opinion reliable as a matter of law. Instead, as the Seventh Circuit has clarified, differential etiology—if done correctly, is *one way* to show medical causation. *Myers*, 629 F.3d at 644 (allowing differential etiology as one form of causation analysis because "there is nothing controversial about that methodology" when done reliability); *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 433 (7th Cir. 2013) (referring to differential etiology as "*a* generally accepted means for evaluating the cause of a plaintiff's injury") (emphasis added); *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proc.*, No. 14 C 1748, 2017 WL 4772759, at *7 (N.D. Ill. Oct. 23, 2017) ("This Court has previously ruled that a differential etiology, if performed properly, is *a* reliable methodology for determining specific causation.") (emphasis added).

Thus, in some contexts, failure to show differential etiology might indeed render an expert opinion unreliable, if that methodology was the primary basis for the expert's testimony and was insufficiently performed. *See Schultz*, 721 F.3d at 433. But here, Dr. Zimmerman did not make a finding of causation solely on grounds of a differential etiology methodology. Rather, he based his findings on analyses of Mr. Sater's medical and personal history, symptoms, and physical evaluation data, analyzed in light of Dr. Zimmerman's knowledge and experience of the field. (ECF 111-1 at 23, 55).

Second, even if Defendants were correct about the legal necessity of differential etiology, they fail to show that Dr. Zimmerman failed to use proper differential etiology here. A differential etiology operates by "ruling in" and "ruling out" certain alternate possible causes and symptoms. *Schultz*, 721 F.3d at 426. Dr. Zimmerman did this.[6] Defendants suggest that Dr. Zimmerman's differential etiology is incomplete because he did not analyze every possible cause or medical record in Mr. Sater's past. But as the Seventh Circuit has made clear, an expert "is not required to rule out every alternative cause" but only "show why a particular alternative explanation is not, in the expert's view, the *sole* cause of the [injury]." *In re In re Testosterone Replacement Therapy*, 2017 WL at *7 (quoting *Myers*, 629 F.3d at 644). Here, Defendants do not even try to posit a specific alternate explanation for the sole cause of Mr. Sater's headaches.[7] They gesture

---

[6] (ECF 111-1 at 16) (ruling out migraine headaches); (*Id.* at 15) (ruling out brain trauma); (*Id.* at 21) (ruling out cluster headaches); (*Id.* at 16) (ruling in causal possibility of "previous neck trauma).

[7] Again, this is not "flipping the burden upside down." It is how evidentiary standards work. Once Plaintiffs have shown by a preponderance of the evidence that Dr. Zimmerman is reliable under Rule 702, it is up to Defendants to show contradictory evidence. Making facial claims about "differential etiology" or "burden shifting" will not do.

13

at Mr. Sater's headaches from over a decade and a half before the crash. But Dr. Zimmerman's testimony shows that he was aware of this evidence and ruled out its relevance based on other evidence that Mr. Sater's headaches had stopped after he received treatment in late 2003. (ECF 111-1 at 46–47). Defendants' "differential etiology" argument fails.

### CONCLUSION

For the foregoing reasons, Defendants' motion is **DENIED**. (ECF 140).

SO ORDERED on March 30, 2026.

/s/ *Cristal C. Brisco*
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT